1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11   SHARAN DEFRANCE,              )
                                   )
12                  Plaintiff,     )
                                   )    No.  CV-05-282-HU
13        v.                       )
                                   )
14   JOANNE B. BARNHART,           )
     COMMISSIONER OF SOCIAL        )    FINDINGS & RECOMMENDATION
15   SECURITY,                     )
                                   )
16                  Defendant.     )
     ——————————————————————————————)
17
     Alan Stuart Graf
18   ALAN STUART GRAF, P.C.
     P.O. Box 98
19   Summertown, Tennessee 38483

20        Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     NEIL J. EVANS
23   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   Joanne E. Dantonio
     SPECIAL ASSISTANT UNITED STATES ATTORNEY
26   Social Security Administration
     701 5th Avenue, Suite 2900 M/S 901
27   Seattle, Washington 98104-7075

28        Attorneys for Defendant

1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Sharan DeFrance brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). I recommend that the Commissioner's final decision be reversed and remanded for additional proceedings.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on June 20, 2002, alleging an onset date of June 1, 2001. Tr. 64-766, 408-11. Her applications were denied initially and on reconsideration. Tr. 22-26, 28-30, 414-21.

On August 5, 2004, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 425-49. On November 18, 2005, the ALJ found plaintiff not disabled. Tr. 9-17. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-8.

FACTUAL BACKGROUND

Plaintiff alleges disability based on schizophrenia. Tr. 71. At the time of the August 5, 2004 hearing, plaintiff was thirty-seven years old. Tr. 495. She has a General Equivalence Diploma (GED), and at the time of the hearing, had completed two years of general studies at Chemeketa Community College. Tr. 125, 429-30. Plaintiff's past relevant work includes dormitory assistant, cashier, data entry clerk, and production worker/assembler. Tr. 72, 446-47.

I. Medical Evidence

Plaintiff has a history of psychiatric hospitalizations for

2 - FINDINGS & RECOMMENDATION

1   psychoses.  The record refers to hospitalizations in December 1994
2   and January 1995, although the actual records themselves are not in
3   this administrative record.  Tr. 225.  Plaintiff was hospitalized
4   again in May 1997, February 2000, and August 2001.  Tr. 205-08,
5   225-26, 227-28, 268-75, 231.  These are discussed more fully below.

6        From May 1995 to May 9, 2000, plaintiff was treated by various
7   providers at the Chemewa Indian Health Center.  Tr. 132-70.  At
8   least for part of that time, she appears to have received regular
9   counseling sessions with a licensed social worker.  E.g., Tr. 168,
10  167, 166, 163, 161, 160  (appointments with social worker from
11  September 25, 1995, to October 7, 1996).  During this time, the
12  social worker indicated that plaintiff suffered from depression,
13  and planned for continued individual counseling.  Id.

14       Also during this time, an unknown provider appears to have
15  seen plaintiff periodically to assess her need for medications.
16  Tr. 156, 155, 152, 151, 149, 148, 146, 140.  (chart notes from
17  various appointments beginning September 1995 to November 1997).
18  These notes refer to plaintiff as suffering from depression and
19  schizoaffective disorder.  Id.  She was being treated with
20  Trazodone[1] and Risperdal[2], and later Zoloft[3].  Id.

21       Although she had been receiving ongoing treatment from
22  Chemewa, plaintiff was admitted to Salem Psychiatric Hospital on
23  May 28, 1997, and discharged June 3, 1997.  Tr. 225-26.  She was

24

25       [1]  A selective serotonin reuptake inhibitor anti-depressant.

26       [2]  An anti-psychotic medication for the treatment of
27  schizophrenia.

28       [3]  A selective serotonin reuptate inhibitor anti-depressant.

3 - FINDINGS & RECOMMENDATION

1  experiencing disorganized thinking, hallucinations, and had been
2  walking in front of traffic.  Id.  She had apparently failed to
3  take her Risperdal, but once treated with medications as an in-
4  patient, she rapidly stabilized.  Tr. 226.  Her final diagnosis was
5  schizophrenia and alcohol abuse.  Id.

6      Following her discharge, she continued to receive treatment at
7  Chemewa, as indicated above.  Her chart notes indicate that she was
8  pregnant in December 1997, and was seen for a possible postpartum
9  bleeding complication in April 1998.  Tr. 139, 140.

10     After that, there is a gap in the records from Chemewa until
11  April 2000.  On February 11, 2000, plaintiff was again admitted to
12  Salem Psychiatric Hospital where she stayed for almost one month,
13  until March 6, 2000.  Tr. 227-28, 269-302.  She was brought to a
14  psychiatric crisis center by her father who was concerned about her
15  ability to take care of her child.  Tr. 227.  She was then
16  transferred to the hospital.  Id.

17     Dr. Scott Babe, M.D., who treated her as an inpatient, noted
18  that she was an extremely difficult patient who denied any symptoms
19  of depression or psychosis.  Id.  He also noted her "severe history
20  of substance abuse."  Id.  She was subjected to numerous tests,
21  including an MRI, CT scan, MMPI, and other neuropsychiatric
22  testing.  Id.  As described by Dr. Babe, the MMPI showed long-term
23  personality problems and possible avoidance and schizoid lifestyle.
24  Id.

25     During her stay, plaintiff was extremely withdrawn.  Id.; Tr.
26  268-302.  She was placed on Zyprexa[4] at an increasing dose and

27  _____

28     [4]  An anti-psychotic medication used to treat schizophrenia.

4 - FINDINGS & RECOMMENDATION

then, approximately four to five days before discharge, given BuSpar[5] because it was thought she could be suffering a "severe depression which would be causing a pseudodementia-like picture." Tr. 227.

Dr. Babe noted plaintiff's past inability to continue with her medications and that she had been "flagrantly psychotic at times." Tr. 228. He also noted that she had had periods of "distinct success" as well. Id. Her admitting and discharge diagnoses were both "confusion," but secondary diagnoses were amphetamine abuse, cocaine abuse, and schizophrenia. Tr. 268. She was discharged on Wellbutrin[6] and Zyprexa. Tr. 228.

Following her discharge from the hospital, plaintiff was assessed by Marion County Mental Health Psychiatric Mental Health Nurse Practitioner Ben Newman, on March 13, 2000. Tr. 185-87. Newman noted that plaintiff's recent hospitalization was precipitated by her arrest for neglecting the care of her son. Tr. 186. He noted that her affect was relatively flat and her behavior was calm. Id. She had some "tangentiality" with vague and illogical responses to questions. Id. Newman noted that her previous history indicated auditory hallucinations. Id. She was somewhat disoriented. Id. He assessed her with the following diagnoses: psychotic disorder, nos; r/o amphetamine induced psychotic disorder; r/o polysubstance dependence (cocaine, amphetamines, drugs of choice); r/o post traumatic stress disorder with delayed onset (related to sexual abuse at age twelve by

---

[5]  An anti-anxiety medication.

[6]  An anti-depressant medication.

5 - FINDINGS & RECOMMENDATION

twenty-one year old male). Tr. 187. Newman remarked that although she denied using illegal drugs, she had a positive test for cocaine and amphetamines while in the psychiatric hospital. Id.

Newman assigned plaintiff with a Global Assessment of Functioning (GAF) of 30. Id. He continued treatment with Zyprexa and Wellbutrin. Id.

Plaintiff was next seen at Marion County Mental Health on April 10, 2000, by Sohyon Goldsmith, Psychiatric Mental Health Nurse Practitioner. Tr. 188-8u9. Goldsmith noted that plaintiff appeared to be a person with schizophrenic, psychotic symptoms. Tr. 188. She recited plaintiff's previous psychiatric symptoms as auditory hallucinations, disorganized thought patterns and speech patterns, anxiety, depressive mood, unable to care for herself, and poor memory. Id.

Plaintiff reported to Goldsmith that she had been compliant with her Zyprexa and Wellbutrin medications and that she felt "balanced." Id. She was currently living with her mother. Id. Her judgment and insight were quite poor, as was her long term memory. Id. Goldsmith's diagnoses were psychotic disorder, nos; r/o schizophrenia, undifferentiated type; r/o amphetamine induced psychotic disorder; r/o poly-substance dependence; and r/o post-traumatic stress disorder secondary to sexual abuse at age twelve. Tr. 189. She assessed her with a GAF of 30, kept her on Zyprexa and Wellbutrin, and intended to refer her to an alcohol and drug treatment program. Tr. 189. Although her note indicates that plaintiff was to return to see Goldsmith three weeks later, there is no record of any subsequent visit. There is a note that she was assessed by the alcohol and drug program on April 21, 200 and was

6 - FINDINGS & RECOMMENDATION

1  determined eligible to receive outpatient treatment. Tr. 194.
2  There are no records of such treatment in this administrative
3  record.

4      Plaintiff returned to Chemewa Indian Health Services for two
5  visits in April 2000. On April 25, 2000, she was seen for a lump
6  in her neck and the chart note refers to her being on Zyprexa. Tr.
7  135. On April 26, 2000, a medical doctor whose signature is
8  illegible, notes that she was taking Zyprexa and Wellbutrin. Tr.
9  133. That physician also noted that she was diagnosed with
10 schizoaffective disorder, a "chronic mental health condition [with]
11 no cure, [with a] lifetime medication need[.]" Id. The physician
12 also opined that plaintiff's "employment status [was] poor." Id.

13     On May 1, 2000, plaintiff was evaluated by Paul S. Stoltzfus,
14 Psy. D., on behalf of Disability Determination Services (DDS). Tr.
15 125-31. At the time, plaintiff was living with her mother who
16 reported her history of symptoms, including paranoia and
17 hallucinations. Tr. 128. Dr. Stoltzfus diagnosed plaintiff as
18 suffering from schizophrenia, paranoid type, in recent remission,
19 with a GAF of 50. Tr. 130. He opined that she appeared to be
20 doing remarkably well with her current medical regime. Id. He
21 remarked that while using her medications, she apparently was no
22 longer paranoid, she was more comfortable with people, more
23 dependable, and was able to provide more consistent care for her
24 son. Tr. 130-31.

25     Dr. Stoltzfus also noted that she was probably able to find
26 some sort of employment. Tr. 130. He stated that plaintiff was
27 eager to find work as a filing clerk or some other simple office
28 job. Id. Cognitively, she functioned in the average range with an

7 - FINDINGS & RECOMMENDATION

1  eighth-grade reading level.  Id.  He concluded that "[w]ith

2  guidance and medical compliance, she is probably able to pursue a

3  variety of employment, particularly within her area of interest in

4  janitorial and menial office work."  Tr. 131.

5     On June 16, 2000, DDS psychologist Dorothy Anderson, Ph.D.,

6  completed a mental residual functional capacity assessment and

7  psychiatric review technique form regarding plaintiff.  Tr. 171-83.

8  Dr. Anderson noted that plaintiff had a history of acute psychotic

9  episodes that improved with treatment.  Tr. 173.  She noted the

10 presence of psychotic features and deterioration that are

11 persistent (either continuous or intermittent), as evidenced by the

12 presence of delusions or hallucinations, the presence of catatonic

13 or other grossly disorganized behavior, and the presence of an

14 inappropriate affect.  Tr. 177.  In rating the severity of

15 plaintiff's impairment, Dr. Anderson found plaintiff to have slight

16 restrictions of daily living and moderate difficulties in

17 maintaining social functioning.  Tr. 182.  She further found that

18 plaintiff would often have deficiencies of concentration,

19 persistence, or pace resulting in the failure to complete tasks in

20 a timely manner in work settings or elsewhere, and that plaintiff

21 once or twice had episodes of deterioration or decompensation in

22 work or a work-like setting which cause the individual to withdraw

23 from that situation or to experience an exacerbation of signs and

24 symptoms.  Id.

25    Dr. Anderson further assessed plaintiff as moderately limited

26 in the ability to understand and remember detailed instructions,

27 the ability to carry out detailed instructions, the ability to

28 maintain attention and concentration for extended periods, and the

8 - FINDINGS & RECOMMENDATION

1  ability to interact appropriately with the general public. Tr.
2  171-72. She determined that plaintiff was able to understand,
3  remember, and follow through on simple tasks and routines without
4  special supervision and had no clear problems with pace. Tr. 173.
5  Although she was generally socially appropriate, Dr. Anderson
6  concluded that plaintiff should have limited public contact. Id.

7       The administrative record contains no relevant records for the
8  time period between Dr. Anderson's assessment and plaintiff's next
9  admission to Salem Psychiatric Hospital on August 14, 2001. Tr.
10 205-09, 231-66. Plaintiff remained an inpatient until September 6,
11 2001. Tr. 231. Her admitting diagnosis was confusion. Id.

12      In an August 15, 2001 history and physical written by Dr.
13 Babe, Dr. Babe noted that while plaintiff had historically
14 responded well to medication, she was chronically medication
15 noncompliant. Tr. 207. He also noted her prior substance abuse.
16 Tr. 207-08.

17      Dr. Babe examined plaintiff on August 15, 2001, and noted that
18 although plaintiff had been living at home, she had become
19 increasingly worse over time and had refused to take medications,
20 and over the past several days before admission, had refused to
21 take care of herself, including not eating, not showering, not
22 seeing to her activities of daily living, and refusing all
23 medications. Tr. 207. By report, she had been mute for three days
24 before admission. Id.

25      Upon admission, plaintiff refused all laboratory tests and
26 refused to allow assessment of her condition. Id. She refused
27 food and fluids and remained mute in her room. Id. Dr. Babe spoke
28 to her in her room with nursing staff present and plaintiff "sat

9 - FINDINGS & RECOMMENDATION

there appearing quite paranoid, shifting her eyes back and forth, and appearing quite fearful." Id. Dr. Babe's assessment at the time was of psychosis, nos; r/o schizoaffective disorder; r/o methamphetamine dependence; r/o cocaine dependence; r/o alcohol dependence; r/o withdrawal state. Tr. 208. He further assessed her GAF at 20. Id.

Her diagnoses on discharge were of schizoaffective disorder with a GAF of 70. Tr. 205. Dr. Babe noted that during her hospital stay, plaintiff continued to refuse food and fluids, but because of a syncopal or pre-syncopal episode, she was treated with IV fluids and provided with Haldol[7]. Id. She continued to be difficult and would often "cheek" her medications. Id. She was switched to Zyprexa which appeared to be more effective. Id. She progressed extremely slowly and was then restarted on Haldol, along with Zyprexa. Id.

She continued to progress slowly, but by the time of discharge, was taking medications and appeared to be more compliant. Tr. 206. She was interacting in groups although she still remained quite mute most of the time. Id. Her relevant medications at discharge were Haldol, Wellbutrin, and Zyprexa. Id. She was discharged to Ryles Center, a facility in Portland. Id.

On September 7, 2001, plaintiff was evaluated by Dr. Neil Falk, M.D., at Ryles Center. Tr. 342-45. After noting her history and recent hospitalization, Dr. Falk observed that at present, plaintiff continued to appear mildly to moderately paranoid and have significant negative symptoms of a chronic psychotic illness,

---

[7] An anti-psychotic medication used to treat schizophrenia.

10 - FINDINGS & RECOMMENDATION

including poverty of content, flat affect, flat speech, and social isolation.  Tr. 342.  Plaintiff appears to have been discharged from Ryles Center on September 20, 2001.  Tr. 344-45.

Plaintiff began care on September 27, 2001, with Dr. Joseph B. Arnold, M.D., at Polk County Mental Health.  Tr. 303-20.  He saw her regularly until at least January 2003.  Id.  Dr. Arnold initially noted that plaintiff continued to show symptoms while an inpatient at Ryles Center, including medication noncompliance, refusal to eat and drink, and exhibition of paranoia.  Tr. 318.  He initially diagnosed her with schizophrenia and assessed a GAF of 40.  Tr. 320.  Her medications were Zyprexa, Haldol, and Wellbutrin.  Id.

On October 30, 2001, Dr. Arnold's diagnosis was paranoid schizophrenia.  Tr. 317.  He noted that plaintiff reported that she was doing well and felt better on this current combination of medications.  Id.

In January 2002, Dr. Arnold changed his diagnoses to drug induced psychosis and catatonic schizophrenia.  Tr. 314-15.  The change was prompted by his finally being able to review the history from the Ryles Center and the Salem Psychiatric Hospital.  Id. Plaintiff reported no psychotic symptoms and doing well.  Id.  Dr. Arnold noted that she was tracking the conversation, was organized, and was taking good care of her son.  Id.  He reduced the dosage of Haldol because of plaintiff's complaints of amenorrhea.  Id.

Plaintiff missed several appointments between January 2002 and May 30, 2002.  Tr. 307.  At that time, she told Dr. Arnold that she had missed these appointments because she was attending school. Id.

11 - FINDINGS & RECOMMENDATION

On July 16, 2002, Polk County Mental Health staff completed an annual update of plaintiff and noted there was no psychosis currently present.  Tr. 348.  Her diagnoses were schizophrenia, catatonic and paranoid types, and polysubstance abuse in remission. Id.  Her treatment plan included medication management with Dr. Arnold, case management for support and resource assistance, and a personal care assistant to monitor medication dispensing and household maintenance.  Id.  Her GAF was assessed at 40.  Id.

Plaintiff continued to see Dr. Arnold regularly and maintain compliance with her medication regimen.  E.g., Tr. 306.  During one visit on July 23, 2002, Dr. Arnold noted that while plaintiff tracked the conversation, she was "slightly off cue."  Id.  He reduced the dosage of Wellbutrin because of plaintiff's request to reduce her medications.  Id.

In an August 27, 2002 letter to DDS, Dr. Arnold, responding to a request from DDS, provided copies of all his mental health assessments, psychiatric evaluations, and progress notes.  Tr. 305. He also stated the following:  "You also requested my opinion concerning this patient's ability to do work-related activity.  My contacts with this individual have been within an office, and therefore, I am unable to offer any opinions other than what is contained the [sic] above referenced data."  Id.  Although the letter bears Dr. Arnold's signature, the signature was put there by someone with the initials "hd."  Id.

Plaintiff saw Dr. Arnold again on November 7, 2002.  Tr. 350. He noted that while she was not psychotic, she reported hearing the doorbell ring at night.  Id.  However, Dr. Arnold did not believe this represented a hallucination.  Id.  Plaintiff reported being

12 - FINDINGS & RECOMMENDATION

1  required to do a job search and not tolerating that stress.  Id.
2  Dr. Arnold remarked that she was not doing a good job of policing
3  her child's behavior during the visit.  Id.  He then stated that "I
4  do not think Sharan is capable of seeking or maintaining gainful
5  employment.  I wrote her a note to that effect."  Id.  No such note
6  appears in the administrative record.

7       That same date, Dr. Arnold sent another letter to DDS, again
8  in response to a request from DDS, and again provided copies of
9  plaintiff's medical records.  Tr. 304.  He also included, verbatim,
10  the same paragraph regarding his opinion of plaintiff's work-
11  related abilities, as in his August 27, 2002 letter:  "You also
12  requested my opinion concerning this patient's ability to do work-
13  related activity.  My contacts with this individual have been
14  within an office, and therefore, I am unable to offer any opinions
15  other than what is contained the [sic] above referenced data."  Id.
16  This letter, like the previous one to DDS, contained Dr. Arnold's
17  signature by "hd."  Id.

18       On November 20, 2002, plaintiff was evaluated by Maribeth
19  Kallemeyn, Ph.D.  Tr. 321-27.  Plaintiff reported to Dr. Kallemeyn
20  that her current medications, Zyprexa and Wellbutrin, helped her
21  "keep a balance," meaning made it easier for her to concentrate on
22  what she was doing.  Tr. 322.  Plaintiff denied that she had
23  current, or past, psychotic symptoms.  Id.  Her current mood was
24  good.  Id.

25       Plaintiff further reported to Dr. Kallemeyn that she was
26  functioning well in her daily life, was consistently caring for her
27  son, was able to do household chores including cooking and cleaning
28  regularly, was regularly exercising, and was benefitting from

13 - FINDINGS & RECOMMENDATION

weekly counseling sessions regarding parenting.    Tr. 326.    In response to a question about her goals for work, plaintiff reported that "I don't want to have a breakdown again and go back to the psychiatric hospital." Tr. 325-26.    She also reported that her "doctor said I should wait." Id. Her current GAF was assessed at 65. Id.

On December 2, 2002, DDS psychologist Peter LeBray, Ph.D., performed a residual functional assessment of plaintiff and completed a psychiatric review technique form.    Tr. 328-41.    He noted plaintiff's schizoaffective disorder and polysubstance abuse in remission.    Tr. 330, 336.    He found that she had one or two episodes of decompensation in work or a work-like setting which cause the individual to withdraw from that situation or to experience an exacerbation of signs and symptoms.    Tr. 333.    He also referred to an attached narrative which does not appear to be in the administrative record.    Tr. 340.

Finally, plaintiff saw Dr. Arnold twice in January 2003.    Tr. 351-52.    Her diagnoses on January 9, 2003, were psychosis, nos; drug abuse mixed, alleged remission; and alcohol abuse, alleged remission.    Tr. 351.    In response to plaintiff's complaints of weight gain, Dr. Arnold started to taper her off Zyprexa and started her on Abilify[8].    Id.    On January 30, 2003, plaintiff reported good results with the new medication, no recurrence of psychotic symptoms, minimal side effects, and weight loss.    Tr. 352.    She seemed to do a good job of managing her son who came with her to the visit, and tracked the conversation.    Id.    Dr. Arnold

---

[8]    An anti-psychotic medication used to treat schizophrenia.

14 - FINDINGS & RECOMMENDATION

1  planned to continue her on Wellbutrin and Abilify.  Id.

2  II.  Medical Expert Testimony

3       During the hearing before the ALJ, Larry Hart, Ph.D.,
4  testified as a medical expert.  Tr. 440-46.  Dr. Hart testified
5  that plaintiff suffered from impairments under Listings 12.03
6  (Schizophrenic, Paranoid, and Other Psychotic Disorders), 12.04
7  (Affective Disorders), and 12.09 (Substance Addiction Disorders).
8  Tr. 440.  In regard to the 12.03 listing, Dr. Hart opined that
9  plaintiff suffered from a drug-induced psychosis, possibly
10 aggravating a schizoaffective condition, which appeared to have
11 remitted.  Tr. 441.  He indicated that the psychotic component
12 "appears to have remitted kind of nicely in '02, lastly in '03 by
13 the file because it's controlled by medications."  Id.  He also
14 remarked that plaintiff had "aggressively ceased at some point in
15 time . . . illicit drugs."  Id.

16      As to the 12.04 listing, Dr. Hart opined that plaintiff was
17 suffering from a major depressive disorder.  Tr. 442.  However, he
18 further opined that it was in significant remission.  Tr. 443.  In
19 regard to the 12.09 listing, he opined that plaintiff had been in
20 remission since August 2001.  Tr. 444-45.

21      Dr. Hart then testified regarding plaintiff's current
22 functioning as of the time of the hearing.  Tr. 445-46.  He
23 assessed her as having "none to slight" impairments in activities
24 of daily living and in social functioning.  Tr. 445.  In the area
25 of concentration, persistence, or pace, he stated that "mostly it
26 looks like seldom, occasional often."  Tr. 445.  The ALJ then asked
27 Dr. Hart to repeat his answer regarding difficulties in
28 concentration, persistence, and pace, and Dr. Hart responded "[f]or

15 - FINDINGS & RECOMMENDATION

1  the most part seldom[,] . . . [m]aybe occasionally it might hit the
2  often level[.]"  Tr. 446.

3  III.  Plaintiff's Testimony

4      Plaintiff testified that she receives General Assistance and
5  is on the Oregon Health Plan.  Tr. 428.  She has gone to community
6  college for the past two years, taking general studies classes
7  full-time.  Tr. 429.  She receives good grades and hopes to pursue
8  a bachelor of arts degree in music, followed by a master's degree
9  in music.  Id.

10     She said she had been sober from alcohol for eight years, and
11 although she initially said she could not answer when she last used
12 methamphetamine, she later suggested, during Dr. Hart's testimony,
13 that she had not used it since the fall of 2001.  Tr. 444.

14     The ALJ inquired about her history of medication
15 noncompliance, noting that she goes "off the deep end" and ends up
16 in the hospital when she stops taking her medication.  Tr. 432.
17 Plaintiff agreed with the ALJ's assessment and noted that if her
18 medication is unavailable or she lacks supervision, she does not
19 take it.  Id.  At the time of the hearing, she was seeing Dr.
20 Arnold every three months, and talked to her counselor Carol
21 Hufendag every Friday "to make sure that I'm doing okay with my
22 medicine."  Id.

23     Plaintiff agreed that she was doing much better at the time of
24 the hearing in August 2004 than she had been in the fall of 2001.
25 Id.  She gave a lot of credit to Dr. Arnold and her counselors who
26 have been there for her and have taken time to call her and help
27 her.  Tr. 432-33.

28     The ALJ asked plaintiff if she thought she could handle having

16 - FINDINGS & RECOMMENDATION

1 a job. Tr. 434. Plaintiff responded that she could not. Id. She
2 explained: "I keep telling myself yes, I can work, I can work and
3 I keep trying to go back and for some reason it just doesn't work
4 out. I can't handle the pressure, I guess." Id. She stated that
5 the last time she worked was in 2001. Tr. 434-35.

6 Plaintiff tried to explain that going to school was different
7 from working because with school, she was doing something positive
8 and learning something she wanted to learn. Tr. 435. At work, she
9 is afraid of not doing her job well and of getting fired, or not
10 performing to her supervisor's expectations. Tr. 436. In the work
11 setting, she lacks self-confidence. Id. She gets fearful, her
12 mind starts running rapidly, and she starts thinking bad things
13 will happen. Id. Then, instead of "facing up and seeing the
14 outcome, [she] just run[s] away from it[.]" Id.

15 IV. Vocational Expert Testimony

16 Vocational Expert (VE) Hanoch Livneh, Ph.D., testified at the
17 hearing. Tr. 446-48. Livneh described plaintiff's past relevant
18 work as dormitory assistant, retail cashier, data entry clerk, and
19 production worker/assembler. Tr. 446-47.

20 The ALJ posed the following hypothetical to the VE: a thirty-
21 seven year old female with about fourteen years of education, with
22 the past relevant work as just described by the VE, who has no
23 exertional limitations, but is limited to occasional contact with
24 others for interaction and would need work of "a steady pace,
25 there's no fluctuation in the demands." Tr. 447. In response, the
26 VE explained that if the fluctuations were only occasional in
27 nature, then the person could perform the past relevant work of
28 data entry clerk and production worker. Id.

17 - FINDINGS & RECOMMENDATION

1  Upon further inquiry from plaintiff's counsel, the VE

2  testified that if the fluctuations were more than occasional

3  nature, "which means if they really start becoming a little bit

4  more frequent," then the person could not perform those positions.

5  Tr. 447-48.

6                        THE ALJ'S DECISION

7  The ALJ found that plaintiff had not engaged in substantial

8  gainful activity since her alleged onset date of June 1, 2001. Tr.

9  13, 17.  The ALJ then determined that plaintiff suffered from the

10  medically severe impairments of schizophrenia, depression, and drug

11  and alcohol abuse in alleged remission. Tr. 14, 17. Id.  However,

12  he found that none of plaintiff's impairments, or combination of

13  impairments, met or equaled a listed impairment.  Tr. 14, 15, 17.

14  Next, the ALJ determined plaintiff's residual functional

15  capacity (RFC). Tr. 15-16.  The ALJ noted that relevant criteria

16  for evaluation of an individual's RFC are:  (1) the individual's

17  activities; (2) the location, duration, frequency, and intensity of

18  the individual's pain or other symptoms; (3) factors that

19  precipitate and aggravate the symptoms; (4) the type, dosage,

20  effectiveness, and side effects of any medication the individual

21  takes or has taken to alleviate pain or other symptoms; (5)

22  treatment, other than medication, the individual receives or has

23  received for relief of pain or other symptoms; (6) any measures

24  other than treatment the individual uses to relieve pain or other

25  symptoms; and (7) any other factors concerning the individual's

26  functional limitations and restrictions due to pain or other

27  symptoms.  Tr. 15-16.

28  The ALJ found plaintiff's testimony partially credible, to the

18 - FINDINGS & RECOMMENDATION

extent that she does have impairments which cause limitations, but not to the extent that she is precluded from all work activities. Tr. 16. He found that the totality of the medical records, in conjunction with Dr. Hart's testimony, revealed that her impairments are only mild when she is compliant with her medications and when she does not abuse drugs or alcohol. Id. He noted that Dr. Stoltzfus, who examined plaintiff in May 2000, stated that she could probably work. Id. The ALJ further noted that plaintiff was enrolled in school and doing well and "numerous treatment records and examinations have noted she is able to function and is able to work when she is compliant with her medications and free from the influence of drugs and alcohol." Tr. 16.

The ALJ then found that plaintiff had the RFC to engage in steady paced work with only occasional contact with others for interaction. Id. She has no exertional limitations. Id. He stated that this RFC "is not inconsistent with the medical record of evidence or with the testimony of the claimant and is therefore adopted as the best evidence of the claimant's overall ability to perform basic work activities." Id. Based on the VE's testimony, the ALJ concluded that with this RFC, plaintiff was able to return to her past relevant work as a data entry clerk and production worker and thus, she was not disabled under the Social Security Act. Tr. 16-17.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to

19 - FINDINGS & RECOMMENDATION

1    last for a continuous period of not less than 12 months[.]"  42

2    U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according

3    to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395

4    (9th Cir. 1991).    The claimant bears the burden of proving

5    disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.

6    1989).  First, the Commissioner determines whether a claimant is

7    engaged in "substantial gainful activity."  If so, the claimant is

8    not disabled.   Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20

9    C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

10   determines whether the claimant has a "medically severe impairment

11   or combination of impairments."  Yuckert, 482 U.S. at 140-41; see

12   20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not

13   disabled.

14       In step three, the Commissioner determines whether the

15   impairment meets or equals "one of a number of listed impairments

16   that the [Commissioner] acknowledges are so severe as to preclude

17   substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20

18   C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is

19   conclusively presumed disabled; if not, the Commissioner proceeds

20   to step four.  Yuckert, 482 U.S. at 141.

21       In step four the Commissioner determines whether the claimant

22   can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e),

23   416.920(e).  If the claimant can, he is not disabled.  If he cannot

24   perform past relevant work, the burden shifts to the Commissioner.

25   In step five, the Commissioner must establish that the claimant can

26   perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§

27   404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its

28   burden and proves that the claimant is able to perform other work

20 - FINDINGS & RECOMMENDATION

1  which exists in the national economy, he is not disabled.  20

2  C.F.R. §§ 404.1566, 416.966.

3       The court may set aside the Commissioner's denial of benefits

4  only when the Commissioner's findings are based on legal error or

5  are not supported by substantial evidence in the record as a whole.

6  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a

7  mere scintilla," but "less than a preponderance."  Id.  It means

8  such relevant evidence as a reasonable mind might accept as

9  adequate to support a conclusion.  Id.

10                              DISCUSSION

11      Plaintiff argues that the ALJ made three errors:  (1)

12  improperly rejected her testimony about her inability to work; (2)

13  improperly rejected her treating physician Dr. Arnold's opinion

14  that she could not work; and (3) failed to incorporate all parts of

15  medical expert Dr. Hart's testimony regarding her limitations in

16  concentration, persistence, and pace.

17  I.  Treating Physician's Opinion

18      If a treating physician's opinion is uncontradicted by another

19  physician, it may be rejected only for clear and convincing

20  reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  If

21  the treating physician's opinion is contradicted, it may be

22  rejected for "specific and legitimate reasons" supported by

23  substantial evidence in the record.  Id.

24      As noted above, on November 7, 2002, Dr. Arnold saw plaintiff

25  and noted plaintiff's report that she was not tolerating the stress

26  of a required job search.  Tr. 350.  His chart note then states

27  that "I do not think Sharan is capable of seeking or maintaining

28  gainful employment.  I wrote her a note to that effect."  Id.

21 - FINDINGS & RECOMMENDATION

1    The ALJ rejected Dr. Arnold's opinion because (1) Dr. Arnold's
2    opinion did not disclose whether plaintiff was using drugs or
3    alcohol; (2) the opinion did not state whether it was based on her
4    mental impairments, her drug or alcohol abuse, or her medical
5    noncompliance; (3) the evidence showed that when she was clean and
6    sober and medically compliant, she was able to work; and (4) Dr.
7    Arnold had previously refused to offer an opinion regarding her
8    ability or inability to work.   Tr. 14.

9    Plaintiff contends that these articulated reasons are not
10   legitimate and are not supported by substantial evidence in the
11   record.   First, plaintiff argues that the ALJ cannot undermine Dr.
12   Arnold's opinion based on Dr. Arnold having listed plaintiff's
13   diagnoses, on that date, as including "drug induced psychosis
14   (provisional diagnosis)," "[d]rug abuse, cocaine, amphetamines,
15   status unknown," and "[a]lcohol abuse, status unknown," when the
16   ALJ himself concluded that plaintiff stopped using drugs in August
17   2001 and alcohol before that.   I agree with plaintiff.

18   The record as a whole, including the records from Polk County
19   Mental Health where Dr. Arnold practiced, supports the ALJ's
20   conclusion that plaintiff abstained from drugs and alcohol
21   beginning at least since August 2001.   Dr. Arnold's chart notes
22   show that when he first examined plaintiff in late September 2001,
23   he diagnosed her with schizophrenia.   Tr. 317-20.   After receiving
24   the records from Ryles Center and Salem Psychiatric Center
25   regarding her August-September 2001 treatment, he changed his
26   diagnosis to drug-induced psychosis.   Tr. 314.

27   However, in July 2002, he changed this diagnosis to a
28   provisional one, suggesting that it was no longer conclusively

22 - FINDINGS & RECOMMENDATION

accurate. A reasonable inference to be drawn from this change is that the basis of plaintiff's psychosis being drug-induced became provisional because plaintiff was no longer using drugs. This inference is further supported by the fact that just two months after opining that plaintiff could not work, Dr. Arnold's diagnoses changed again. Tr. 351. On January 9, 2003, his diagnoses were psychosis NOS, and alcohol and drug abuse in alleged remission. Id. Moreover, on July 16, 2002, Polk County Mental Health staff conducted a one-year mental health update of plaintiff's status and diagnosed her polysubstance abuse as being in remission. Tr. 348. Thus, the Polk County Mental Health records show that plaintiff's diagnosis of psychosis, which remained throughout her treatment there, was at some point no longer attributable to her illegal drug and alcohol abuse.

Other evidence in the record confirms that at the time Dr. Arnold expressed his November 7, 2002 opinion regarding plaintiff's inability to work, her drug and alcohol abuse was in remission. E.g., Tr. 336 (December 2, 2002 report of DDS psychologist Dr. Peter LeBray notes polysubstance abuse in remission).

Given the evidence in the record as a whole, given that Dr. Arnold's chart notes lack any basis for concluding that he suspected she was continuing to use drugs while under his care, and given that the ALJ himself found sufficient evidence in the record to conclude that plaintiff had not used drugs or alcohol beginning at least in August 2001, rejecting Dr. Arnold's opinion because it failed to disclose whether plaintiff was using drugs or alcohol at the time was not proper.

The same reasoning applies to the ALJ's suggestion that Dr.

23 - FINDINGS & RECOMMENDATION

1    Arnold's opinion is not credible because it does not indicate if it
2    is based on her medication noncompliance.  While the record clearly
3    demonstrates that plaintiff decompensates into psychosis when she
4    does not take her medications, there is no suggestion whatsoever
5    from Dr. Arnold's chart notes that plaintiff had failed or refused
6    to take her medications since September 2001 while treating with
7    him.  Even when plaintiff missed appointments with Dr. Arnold
8    (which she explained to Dr. Arnold as due to school attendance),
9    she still called in to get her medications refilled.  E.g., Tr.
10   308, 311.  Because plaintiff was compliant with her medications
11   during her treatment with Dr. Arnold, and when he reached his
12   diagnosis, there was no need for Dr. Arnold to discuss it in the
13   context of his opinion on plaintiff's inability to work.  Where the
14   record supports the diagnosis, there is no requirement that the
15   treating physician discuss the myriad diagnoses not found, nor the
16   potential causes not found.  Thus, the ALJ's rejection of Dr.
17   Arnold's opinion because it did not specify if it was based on
18   plaintiff's medication noncompliance, was improper.

19        Second, plaintiff argues that to the extent the ALJ rejected
20   Dr. Arnold's opinion because the basis of the opinion was unclear,
21   the ALJ was obligated to further develop the record by recontacting
22   Dr. Arnold.  As explained in a 1996 case, if the ALJ thinks he or
23   she needs to know the basis of the physician's opinions in order to
24   evaluate them, he has "a duty to conduct an appropriate inquiry,
25   for example, by subpoenaing the physicians or submitting further
26   questions to them[,]" or "continu[ing] the hearing to augment the
27   record."  Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).

28        Defendant contends that further development of the record as

24 - FINDINGS & RECOMMENDATION

suggested in <u>Smolen</u> is required only when a report is ambiguous or the evidence as a whole is insufficient to make a disability determination.   Defendant argues that here, there was more than adequate evidence upon which to evaluate plaintiff's limitations. Defendant also suggests that the fact that a physician's opinions were in conflict with other evidence or lacked clarity does not trigger a duty to recontact the physician but instead, provides a reason to discount the physician's opinion.

The ALJ stated that Dr. Arnold "fails to quantify his opinion as to whether the claimant's inability [to work] lies due to her mental impairments, her polysubstance abuse, her non-compliance with medication or a combination thereof."   Tr. 14.   For the reasons discussed immediately above, there is no basis in the record to support a conclusion that Dr. Arnold's opinion could have been based on plaintiff's polysubstance abuse or her non-compliance with medication.   Thus, of the possible bases offered by the ALJ, the only remaining basis for Dr. Arnold's opinion is that plaintiff's inability to work is due to her mental impairments.

Third, plaintiff argues that while the medical records show that once she became clean and sober and compliant with her medications, her functioning significantly improved, this is not a legitimate basis for rejecting Dr. Arnold's November 2002 opinion that she could not work.   Plaintiff testified to the significant stress she experiences in a work setting, and reported to Dr. Arnold the stress she experienced with looking for work, and testified how a work setting is distinguishable from her ability to cope with school.

She further contends that the ALJ's reliance on her

25 - FINDINGS & RECOMMENDATION

significant improvement in life functioning and her ability to handle the pressures of a community college curriculum as a basis for rejecting her treating physician's opinion that she cannot work, conflicts with Social Security Regulation (SSR) 85-15 (available at 1985 WL 56857). The regulation notes that individuals with mental disorders often have highly individualized responses to work stress and though they may be able to adopt a certain lifestyle within which they appear to function well, and may function adequately in the community with good mental health services, they still may not be able to meet "the requirements of even so-called 'low-stress' jobs." 1985 WL 56857, at *6.

Defendant argues that an opinion that is inconsistent with the rest of the evidence is properly rejected. Defendant notes that Dr. Arnold's notes support the ALJ's conclusion that once plaintiff became medically compliant and stopped using drugs and alcohol, her function improved. Defendant further notes that with the exception of the November 7, 2002 chart note where Dr. Arnold opined that she was unable to work because she could not tolerate the stress of a work search, the remainder of his notes indicate that she had no abnormalities on mental status examination, was doing well, was having no problems, had no psychotic symptoms, and was able to take good care of her son.

While defendant accurately depicts Dr. Arnold's chart notes, I agree with plaintiff that the fact that the medical evidence generally supports the ALJ's finding that her functioning improved significantly after she stopped using drugs and abusing alcohol and

26 - FINDINGS & RECOMMENDATION

became compliant with her medications[9], is not a legitimate basis
to reject Dr. Arnold's opinion about the effect on her of work-
related stress.    During the several years of medical records
contained in the administrative record, there does not appear to
have been a time when plaintiff sustained medication compliance and
sobriety while working.    Thus, there is no evidence in the record
affirmatively showing plaintiff's ability to sustain her medication
regimen and sobriety while working.    Given the references in the
record to the episodic nature of her disease, e.g., Tr. 326 (Dr.
Kallemeyn's diagnosis of episodic schizophrenia), and the fact that
Dr. Arnold had full knowledge of her improved functioning and
school endeavors, but nonetheless still opined that she could not
work, there is no support for the ALJ's rejection of Dr. Arnold's
opinion based on her improved functioning outside of the workplace.

     Finally, in support of his rejection of Dr. Arnold's opinion,
the ALJ noted that in August 2002, Dr. Arnold had refused to state
an opinion on the issue of plaintiff's work abilities.    Tr. 14.
Defendant argues that a contradiction between a doctor's opinion
and that doctor's notes and observations is a clear and convincing
reason for not relying on the doctor's opinion.

     There are several problems with the ALJ's rejection of Dr.
Arnold's opinion based on the August 27, 2002 letter from Dr.
Arnold to DDS.    First, the letter, after indicating that it was

---

[9]    While defendant's references to comments appearing in Dr.
Arnold's chart notes are accurate, defendant omits a reference by
Dr. Arnold to plaintiff being "off cue," and on one visit, doing
a poor job of policing her child's behavior.    Thus, the chart
notes generally support the ALJ's determination that her
functioning improved significantly, but they nonetheless reflect
occasions of less than desirable functioning.    Tr. 306, 350.

27 - FINDINGS & RECOMMENDATION

enclosing all mental health assessments, initial psychiatric

evaluations, and progress notes, then went on to state:

> You also requested my opinion concerning this patient's
> ability to do work-related activity.  My contacts with
> this individual have been within an office setting, and
> therefore, I am unable to offer any opinions other than
> what is contained the [sic] above referenced data.

Tr. 305.  The letter does not refuse to offer an opinion.  Rather,

it refuses to offer an opinion separate from what may be reflected

in the mental health assessments, initial psychiatric evaluations,

and progress notes.  As of August 27, 2002, none of those

assessments, evaluations, or notes makes an express reference or

opinion to plaintiff's ability or inability to work.  Thus, the

August 27, 2002 letter, when written, did not contradict Dr.

Arnold's November 7, 2002 opinion that plaintiff cannot work.

Second, on the date Dr. Arnold offered his opinion that

plaintiff cannot work, November 7, 2002, he issued a virtually

identical letter to DDS.  Tr. 304.  There, he indicates he is

sending, again, all mental health assessments, initial psychiatric

evaluations, and progress notes.  Id.  He then stated the same

paragraph, word for word including the presumably inadvertent

omission of the word "in" between "contained" and "the."  Again,

this is not a refusal to state an opinion but rather, is a refusal

to state an opinion other than what is in the assessments,

evaluations, and notes.  Notably, included in those notes is the

November 7, 2002 progress note in which Dr. Arnold states that "I

do not think Sharan is capable of seeking or maintaining gainful

employment."  Tr. 350.  Accordingly, one interpretation of this

evidence is that there is no contradiction between the letter and

the progress note.

28 - FINDINGS & RECOMMENDATION

1    However, this could also be interpreted as a contradiction,
2    but it is at best ambiguous and cannot, on this record,
3    legitimately be used to negate Dr. Arnold's opinion. This
4    ambiguity should have been resolved by the ALJ with Dr. Arnold.

5    Because none of the reasons offered by the ALJ for rejecting
6    Dr. Arnold's opinion are legitimate bases supported in the record,
7    the ALJ erred in rejecting Dr. Arnold's opinion.

8    II.  Plaintiff's Testimony

9    Once a claimant shows an underlying impairment and a causal
10    relationship between the impairment and some level of symptoms,
11    clear and convincing reasons are needed to reject a claimant's
12    testimony if there is no evidence of malingering. Smolen, 80 F.3d
13    at 1281-82.  When determining the credibility of a plaintiff's
14    limitations, the ALJ may properly consider several factors,
15    including the plaintiff's daily activities, inconsistencies in
16    testimony, effectiveness or adverse side effects of any pain
17    medication, and relevant character evidence. Orteza v. Shalala, 50
18    F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the
19    ability to perform household chores, the lack of any side effects
20    from prescribed medications, and the unexplained absence of
21    treatment for excessive pain when determining whether a claimant's
22    complaints of pain are exaggerated.  Id.

23    The ALJ rejected plaintiff's testimony about her inability to
24    work.  He gave the following explanation:

25        Careful consideration has been given to the
          claimant's testimony and it has been found to be somewhat
26        credible to the extent she does have impairments which do
          cause limitations, but not to the extent she is preclude
27        [sic] from all work activities.

28        The totality of the medical records in conjunction

29 - FINDINGS & RECOMMENDATION

1    with the testimony of the medical expert reveals
     plaintiff's impairments are only mild when she is
2    compliant with her medications and not abusing drugs and
     alcohol.  Dr. Stoltzfus, who examined claimant in May
3    2000[,] noted that she "could probably work."  Exhibit
     1F.  There is no objective reason why she could not be
4    employed as of August 2001.  She has been and is
     currently enrolled in school and is doing well [fn 1] and
5    numerous treatment records and examinations have noted
     she is able to function and is able to work when she is
6    compliant with her medications and free from the
     influence of drugs and alcohol.

7
          fn 1.  She testified that for the last two years,
8         she has carried as [sic] course load and earns good
          grades, except a speech class where she found
9         public speaking too difficult for her.

10   Tr. 16.

11       Plaintiff argues that the ALJ erred in rejecting her testimony

12   because the ALJ's reasoning is impermissibly vague and Dr.

13   Stoltzfus's opinion is ambiguous in the context of his assessment

14   that plaintiff had a GAF of 50.  Moreover, plaintiff argues, her

15   testimony is supported by her treating physician and the

16   recognition expressed by SSR 85-15, noted above, that individuals

17   with mental disorders may function adequately in certain contexts,

18   but still be unable to cope with work stress.

19       Defendant concedes that the ALJ did not list, in the specific

20   paragraph containing his findings, the medical reports upon which

21   he relied in evaluating plaintiff's credibility.  But, defendant

22   argues, the ALJ's summary of those records in a preceding part of

23   his decision, is sufficient.

24       While I agree with defendant that the ALJ need not recite

25   "magic words" in his decision, I cannot agree that a summary of the

26   medical evidence in the context of an entirely separate part of the

27   sequential analysis provides the required clear and convincing

28   reasons need to reject a plaintiff's subjective testimony.  The ALJ

30 - FINDINGS & RECOMMENDATION

summarized plaintiff's medical records in his assessment of step two of the analysis, requiring a determination of whether the claimant has a medically severe impairment or combination of impairments.    The summary does not articulate why plaintiff's testimony on the issue  of her ability to work is undermined by the vast majority of the medical testimony regarding her improved stability while compliant with her medications and while sober and abstaining from drug use.

Given plaintiff's particular disease, the ALJ needed to clearly and convincingly articulate why plaintiff's significant improvement in overall life functioning is transferable to a workplace setting, thus making her testimony to the contrary not credible.    The ALJ failed to do this, instead citing to the "totality of the medical records" which simply support the bulk of plaintiff's testimony that she is indeed experiencing significant improvement.

Next, plaintiff contends that the one specific piece of evidence cited by the ALJ in support of his rejection of her testimony is internally inconsistent and thus, is not a clear and convincing reason for such rejection.    I agree with plaintiff.

The ALJ stated that in May 2000, Dr. Stoltzfus examined plaintiff and remarked that she "could probably work."    Tr. 16. However, as plaintiff notes, at the same time that Dr. Stoltzfus offered this opinion, he assessed plaintiff with a GAF of 50.    Tr. 130.   A GAF of 50 is defined as "[s]erious symptoms (e.g., suicide ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   Am. Psychiatric Ass'n,

31 - FINDINGS & RECOMMENDATION

Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) (DSM-IV-TR).

Dr. Stoltzfus's comments about plaintiff's ability to work are inconsistent with his own GAF assessment and thus, are ambiguous. As such, his opinion about her work ability is not a clear and convincing reason upon which to reject plaintiff's subjective testimony. Moreover, neither the ALJ, nor defendant attempts to reconcile Dr. Stoltzfus's May 1, 2000 comments about plaintiff's work ability with the statement made by plaintiff's treating physician at Chemewa Indian Health Services only four days earlier that her employment status was poor. Tr. 133. Finally, the ALJ failed to analyze whether Dr. Stoltzfus's opinion about plaintiff's probable ability to work is undermined by the fact that subsequent to that opinion, plaintiff was hospitalized again in 2001.

Because the ALJ failed to articulate clear and convincing reasons for rejecting plaintiff's subjective testimony, he erred.

III.  Medical Expert

Plaintiff contends that Dr. Hart's testimony actually shows that plaintiff would experience limitations in concentration, persistence, and pace up to one-third of the workday, and that the ALJ failed to include this limitation in his hypothetical to the VE.

As noted above, Dr. Hart opined that occasionally, plaintiff would often have increased limitations in maintaining concentration, persistence, or pace. Tr. 446 ("[f]or the most part seldom[,] . . . [m]aybe occasionally it might hit the often level[.]" Tr. 446. Plaintiff contends that the Social Security

1   Administration defines "occasionally" as one-third of the workday
2   and that Dr. Hart's testimony amounted to an opinion that for up to
3   one-third of the workday, plaintiff would often have lapses in
4   concentration, persistence, and pace.    Plaintiff argues that
5   failure to include this in the hypothetical to the VE was error.
6   Plaintiff further contends that remand to the VE is unnecessary
7   because Dr. Hart's opinion conclusively establishes that plaintiff
8   is disabled.

9       Dr. Hart's testimony is ambiguous.    In one sentence, he uses
10  "for the most part," "seldom," "occasionally," and "often" along
11  with "maybe" and "might."    While one can speculate about the
12  intended   opinion   regarding   plaintiff's   limitations   in
13  concentration, persistence, and pace, a guess is not good enough.
14  SSR 83-10 defines "occasionally" as "occurring from very little up
15  to one-third of the time."    SSR 83-10 (found at 1983 WL 31251, at
16  *5). It is unclear if Dr. Hart used "occasionally" to mean "very
17  little" or "up to one-third of the time."    An additional concern
18  with plaintiff's argument is that this definition, at least as
19  contained in SSR 83-10, is used to define the requirement of a
20  sedentary exertional level.    Id.    There is no indication that the
21  same definition applies to the use of the term in regard to an
22  individual's limitations in concentration, persistence, or pace.
23  This ambiguity should have been clarified with Dr. Hart by the ALJ.
24  IV.   Remand for Additional Proceedings or Benefits

25      The court has discretion to reverse the Commissioner's final
26  decision with or without a remand for further administrative
27  proceedings.   Harman v. Apfel, 211 F.3d 1172, 1177 (9th Cir. 2000).
28  When an ALJ improperly rejects evidence, the court should credit

such evidence and remand for an award of benefits when:  "'(1) the ALJ failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.'"  Moore v. Commissioner, 278 F.3d 920, 926 (9th Cir. 2002) (quoting Smolen, 80 F.3d at 1292).

This Court is aware of Ninth Circuit cases recognizing that the "crediting as true" rule is not mandatory.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).  Thus, when a court finds that the ALJ improperly rejected the subjective symptom testimony of a claimant, it has some flexibility and is not required to credit the testimony as a matter of law and direct an award of benefits.  Id.  However, this Court has previously suggested that the rule remains mandatory where the ALJ has improperly rejected the opinion of a treating physician.  Kirkpatrick v. Barnhart, No. CV-03-657-HU, Op. & Ord. Adopting F&R at p. 2-3 (D. Or. Sept. 16, 2004); see also Benecke v. Barnhart, 379 F.3d 587, 594-95 (9th Cir. 2004) (in a post-Connett case, Ninth Circuit credited the opinions of treating physicians and claimant's testimony when ALJ failed to provide legally sufficient reasons for rejecting this evidence, and reversed a district court order of remand for further administrative proceedings and instructed that the district court remand for payment of benefits).  Of course, the doctor's opinion must not be ambiguous or the Court will not know which interpretation to credit as true.

Here, I conclude that remand for additional proceedings is

34 - FINDINGS & RECOMMENDATION

appropriate because the <u>Smolen</u> test is not met.  Although the ALJ failed to provide legally sufficient reasons for rejecting Dr. Arnold's opinion that plaintiff was incapable of seeking or maintaining gainful employment, Dr. Arnold's opinion, when viewed in the context of the November 2, 2002 boilerplate letter, is unclear and thus, does not by itself provide a basis upon which to award benefits.  That is, while the November 2, 2002 boilerplate letter could not legitimately be used to reject Dr. Arnold's opinion of that same date that plaintiff could not seek or maintain employment, the fact that his opinion was issued on the same date as that letter makes the opinion ambiguous.  The ALJ should have obtained clarification from Dr. Arnold in the first instance and having failed to do so then, the case should be remanded to the ALJ to do so now.

Additionally, Dr. Hart's testimony is also ambiguous, creating another outstanding issue that should be resolved before a determination of disability can be made.  Given that remand for additional evidence is appropriate for clarification of Dr. Arnold's opinion and Dr. Hart's testimony, it is appropriate to remand for additional proceedings even though the ALJ also improperly rejected plaintiff's testimony. With the uncertainty in the medical evidence, the ALJ should, after clarifying the medical evidence, be given the opportunity to reevaluate plaintiff's testimony at that time.

CONCLUSION

The Commissioner's decision should be reversed and the case remanded for additional proceedings.

/ / /

35 - FINDINGS & RECOMMENDATION

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 30, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due June 13, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __12th__ day of __May__, 2006.


_/s/ Dennis James Hubel_
Dennis James Hubel
United States Magistrate Judge

36 - FINDINGS & RECOMMENDATION